MARTHA S. ARMOUR, complainant-appellant, respondent on cross-appeal,

*v.*

BERNARD R. ARMOUR, defendant-respondent, appellant on cross-appeal.

[Argued February 7th, 1944. Decided April 20th, 1944.]

COLIE, J. (Dissenting.)

I dissent from the majority of the court in case 214 in which this court affirmed the court below in awarding the sole custody of three female children, respectively eleven, nine and seven, to the father, with strictly limited rights of visitation on the part of the mother.

The legislature, by *R. S. 9:2–4* has provided that:

"In making an order or decree relative to the custody of the children pending a controversy between their parents, or in regard to their final possession, the rights of both parents, in the absence of misconduct, shall be held to be equal, and they shall be equally charged with their care, nurture, education and welfare, and the happiness and welfare of the children shall determine the custody or possession.

"The court may make the necessary orders and decrees from time to time in relation to such custody or possession, but the father, as such, shall not have preference over the mother as to the award of custody of such minor child if the best interests of the child otherwise may be protected, * * *."

This enactment makes it clear that the happiness and welfare of the child or children is determinative on the question of custody. Under the terms of the decree appealed from, the court's action was based upon its finding "that it is for the best interest of said children's welfare that they at once go to the defendant's [father] sole custody." There was no testimony showing with which parent the children would be the happier.

The right of the parents being equal, except upon proof of "misconduct" amounting to unfitness, it follows that the court below and this court found that the mother was guilty of "misconduct." A careful study of the testimony discloses no facts or inferences therefrom which justified the action taken. It would seem common sense that the upbringing of young daughters under normal circumstances would be better served by the mother than by the father, where, as here, he is actively engaged in manifold business duties and the supervision of the children therefore would have to be left largely to hired employees. If this viewpoint is correct, there must be some compelling reason to justify a court in taking these children from their mother and placing their custody in the father alone. The majority opinion does not detail the facts which led to its conclusion, excepting one paragraph of the opinion which reads as follows:

"Certain testimony was given at the hearing by a former governess and the chauffeur's wife, who sometimes helped with the children, which information had not previously been disclosed to the husband or his counsel. This testimony had a bearing upon the fitness of the mother to have custody of the children. If true, it tended to show knowledge of sex relations imparted to or acquired by these children far beyond the knowledge or information which is normally possessed by children of their ages. It is especially pertinent when coupled with the undisputed fact that the mother read to the children a book concerning sex, having to do with the birth of children. The age of these children at that time ranged from about three to six years. Both the governess and a maid refused to read this book to the children at the mother's request, whereupon she stated that she would do so herself. It is not disputed that the mother had a fondness for pictures of nude people of which she had a collection. She insisted on keeping them against her husband's strong aversion and objection. She also had several books on sex, one of which advocated sex freedom, a change in the law to the effect that adultery should not be a ground for divorce and the permitting of obscene publications. The respondent charges that when he remonstrated with his wife for her approval and

adherence to the philosophy of the writer of this book and for having the pictures and other sex books, she chided him for being old fashioned and mid-Victorian. He says that she invited him to read the book and that she repeatedly demanded that he agree to give her her sex freedom to the end that he could have a mistress and she a lover. Appellant denies that she made any such demand or suggestion or that she agreed with the philosophy of the book mentioned. She also denies having possessed obscene books described by him."

The incident or incidents testified to by the governess, Miss Hoffman, with relation to the children playing about the mother's bed and romping with her while she was in a nightgown was more susceptible of an innocent interpretation than the interpretation placed upon it by the governess. In admeasuring the weight of this testimony, it is to be borne in mind that the witness was discharged by Mrs. Armour in May, 1940, and that despite her interpretation of the incident, she did not see fit to impart knowledge of it to Mr. Armour for over three years. He first learned of it during the course of the hearings before the advisory master, which hearings commenced in April, 1943. These factors weigh heavily in determining what credibility is to be accorded this witness. The same witness also testified that Mrs. Armour gave her a book on sex to read to the children. One Sophie Bogacz, the chambermaid or waitress, also testified that Mrs. Armour asked her to read the book to the children but she found the book so embarrassing that she would not read it.

The majority opinion says, speaking of the testimony of these witnesses, that "if true, it tended to show knowledge of sex relations imparted to or acquired by these children far beyond the knowledge or information which is normally possessed by children of their ages." The ages of the children were then from six to three years. It may be that the reading of this book to a three-year-old was not the best judgment. Most assuredly it is a frail support for a finding of "misconduct." The book, written by Karl de Schweinitz, a biologist and psychologist, is entitled "Growing Up." In simple language, it tells the story of how the ovum is fertilized by the sperm: how the egg or fetus grows in the body of the

mother and how, in due course, the offspring is born. There is not one sentence in this book that is salacious or obscene. It attempts to explode the one-time fashionable myths that babies are brought by storks, are found under gooseberry bushes and like nonsense. It is a startling proposition to find a court of law disapproving of a mother's efforts to educate properly her children in the matter of sex. The book has been approved by psychologists, pediatricians and child educators throughout the country. An enlightened viewpoint on this subject is that of Judge Augustus N. Hand, speaking for the United States Circuit Court of Appeals in *United States* v. *Dennett, 39 Fed. Rep. (2d) 564; 76 A. L. R. 1092.* In that case the court reversed the conviction of one Mary W. Dennett for mailing obscene matter in violation of the statute. I borrow from the opinion at length since it so clearly and ably expresses the point of view which, in my judgment, should have guided this court.

"It may be assumed that any article dealing with the sex side of life and explaining the functions of the sex organs is capable in some circumstances of arousing lust. The sex·impulses are present in every one, and without doubt cause much of the weal and woe of human kind. But it can hardly be said that, because of the risk of arousing sex impulses, there should be no instruction of the young in sex matters, and that the risk of imparting instruction outweighs the disadvantages of leaving them to grope about in mystery and morbid curiosity and of requiring them to secure such information as they may be able to obtain from ill-informed and often foul-minded companions, rather than from intelligent and high-minded sources. It may be argued that suggestion plays a large part in such matters, and that on the whole the less sex questions are dwelt upon the better. But it by no means follows that such a desideratum is attained by leaving adolescents in a state of inevitable curiosity, satisfied only by the casual gossip of ignorant playmates. ·

"The old theory that information about sex matters should be left to chance has greatly changed, and, while there is still a difference of opinion as to just the kind of instruction which ought to be given, it is commonly thought in these

days that much was lacking in the old mystery and reticence. This is evident from the current literature on the subject, particularly such pamphlets as 'Sex Education,' issued by the Treasury Department United States Public Health Service in 1927.  *  *  *

"We have been referred to no decision where a truthful exposition of the sex side of life, evidently calculated for instruction and for the explanation of relevant facts, has been held to be obscene. In *Dysart* v. *United States, 272 U. S. 655; 47 S. Ct. 234; 71 L. Ed. 461,* it was decided that the advertisement of a lying-in retreat to enable unmarried women to conceal their missteps, even though written in a coarse and vulgar style, did not fall within prohibition of the statute, and was not 'obscene' within the meaning of the law.

"The defendant's discussion of the phenomena of sex is written with sincerity of feeling and with an idealization of the marriage relation and sex emotions. We think it tends to rationalize and dignify such emotions rather than to arouse lust. While it may be thought by some that portions of the tract go into unnecessary details that would better have been omitted, it may be fairly answered that the curiosity of many adolescents would not be satisfied without full explanation, and that no more than that is really given. It also may reasonably be thought that accurate information, rather than mystery and curiosity, is better in the long run and is less likely to occasion lascivious thoughts than ignorance and anxiety. Perhaps instruction other than that which the defendant suggests would be better. That is a matter as to which there is bound to be a wide difference of opinion, but, irrespective of this, we hold that an accurate exposition of the relevant facts of the sex side of life in decent language and in manifestly serious and disinterested spirit cannot ordinarily be regarded as obscene. Any incidental tendency to arouse sex impulses which such a pamphlet may perhaps have is apart from and subordinate to its main effect. The tendency can only exist in so far as it is inherent in any sex instruction, and it would seem to be outweighed by the elimination of ignorance, curiosity and morbid fear. The direct

aim and the net result are to promote understanding and self-control."

As further bearing on the unfitness of the mother and as evidential of her "misconduct," the court calls attention to her "fondness for pictures of nude people of which she had a collection." It must be borne in mind that there is no evidence that these pictures were shown to any of the children. They were the possessions of Mrs. Armour and were introduced before the advisory master by the husband, he having taken possession of them when she left their Englewood home to move to South Orange. The record brings up reproductions of these thirty-five works of art, every one of which has won a place in a well known art gallery. Eighteen of the paintings or pieces of sculpture were, at one time, in the Louvre in Paris. They include masterpieces by Rembrandt. Giorgione, Michelangelo, Praxiteles, and Titian, to mention but a few. The court below and this court emphasized the possession of these pictures of nudes. There is nothing sinful in nakedness *per se,* and that Mrs. Armour permitted her children to see her in that state is no basis upon which to judge her unfit to have the custody of these children. The statement in the majority opinion that "she had several books on sex, one of which advocated sex freedom, a change in the law to the effect that adultery should not be a ground for divorce and the permitting of obscene publications" refers to "Marriage and Morals," by Bertrand Russell. Whether one agrees or disagrees with the author's viewpoint is immaterial. The significant fact is that the court sets itself up as a censor of an individual's preference in matters of reading. There is no such prerogative in any court.

The equitable jurisdiction of custody is "a delicate one; it rests in the highest degree upon the enlightened discretion of the court, and will only be exercised when plainly demanded as the means of securing the infant's present and future well-being. It is well settled, therefore, that a court of equity may interfere on behalf of infants, and remove them from the custody and control of their father or mother, *whenever the habits, practices, instruction, or example of the parent, exerting a personal influence on the infants, tend*

*to corrupt their morals and undermine their principles."*
(Italics mine.) *3 Pom. Eq. Jur. (4th ed.), § 1307.*

The record will be searched in vain for evidence that Mrs. Armour's habits, practices, instruction or example had an influence on her children tending to corrupt their morals and undermine their principles. In fact, the testimony of the children's spiritual advisers and teachers stands undisputed that they were normal, wholesome children.

My disagreement with the holding of the majority goes to a more fundamental principle. When a court undertakes to proscribe the possession and enjoyment of reproductions of paintings and statuary and when it undertakes to proscribe certain types of reading and makes such possession and enjoyment evidential on the question of unfitness and misconduct, it is trespassing upon forbidden fields and is guilty of anachronistic thinking. For a court to set itself up as a censor of an individual's personal predilection in matters of art and reading, is an unwarranted blow at personal freedom.

For the reasons stated, I think that the decree under appeal, in so far as it deprives the mother of the custody of these children, should be reversed.

Justices Bodine, Donges and Perskie, Judges Wells and Dill authorize me to say that they concur in the views expressed herein.